E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MATTHEW O'BRIEN (Cal. Bar No. 261568)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Public Corruption and Civil Rights Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-8644/3819
    Facsimile: (213) 894-0141
    E-mail:   Matthew.O'Brien@usdoj.gov
           Brian.Faerstein@usdoj.gov

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
GARY N. DONNER
Senior Trial Attorney, Environmental Crimes Section
    150 M Street, N.E.
    Washington, DC 20002
    Telephone:   (202) 305-0338
    Facsimile:   (202) 514-8865
    E-mail:   Gary.Donner@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>        v.<br><br>JOSE MANUEL PEREZ,<br>aka "Julio Rodriguez,"<br><br>       Defendant. | No. CR 22-00057(A)-FMO-1<br><br>GOVERNMENT'S SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT REGARDING DEFENDANT JOSE MANUEL PEREZ; DECLARATION OF MATTHEW O'BRIEN AND EXHIBITS THERETO<br><br>Hearing Date: January 26, 2023<br>Hearing Time: 2:00 p.m.<br>Location:   Courtroom of the Hon. Fernando M. Olguin |

1    Plaintiff United States of America, by and through its counsel

2   of record, the United States Attorney for the Central District of

3   California and Assistant United States Attorneys Matthew O'Brien and

4   Brian Faerstein and Trial Attorney Gary Donner, hereby files its

5   Sentencing Memorandum and Objections to the Presentence Investigation

6   Report Regarding Defendant JOSE MANUEL PEREZ.

7    This submission is based upon the attached memorandum of points

8   and authorities and the accompanying Declaration of Matthew O'Brien

9   and exhibits thereto, the Presentence Investigation Report and

10  Recommendation Letter disclosed on December 21, 2022, the files and

11  records in this case, and such further evidence and argument as the

12  Court may permit.

13   Dated:  January 9, 2023          Respectfully submitted,

14                                    E. MARTIN ESTRADA
                                      United States Attorney
15
                                      SCOTT M. GARRINGER
16                                    Assistant United States Attorney
                                      Chief, Criminal Division
17

18                                    _____/s/_____

19                                    MATTHEW O'BRIEN
                                      BRIAN FAERSTEIN
                                      Assistant United States Attorneys
20
                                      GARY DONNER
21                                    Senior Trial Attorney, ECS

22                                    Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA
23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

I.   INTRODUCTION....................................................1

II.  STATEMENT OF FACTS.............................................2

     A.   Defendant's Smuggling Scheme.............................2

     B.   Defendant's Flight to Mexico While on Pretrial Release....4

III. THE PSR AND THE GOVERNMENT'S OBJECTIONS........................5

IV.  THE GOVERNMENT'S SENTENCING RECOMMENDATION.....................7

     A.   The Sentencing Enhancements.............................7

          1.   The Market Value of the Smuggled Wildlife...........7

          2.   Defendant's Role in the Scheme....................10

          3.   Defendant's Obstruction of Justice................14

          4.   Pecuniary Gain/Commercial Purpose.................15

     B.   The Nature and Circumstances of the Offense............15

     C.   Defendant's History and Characteristics................17

          1.   Defendant's Assault with a Deadly Weapon..........17

          2.   Defendant's Assault of His Sister.................19

          3.   Defendant's Drug Use..............................20

          4.   Defendant's Post-Indictment Conduct in This Case....20

     D.   The Section 3553(a)(2) Factors.........................22

     E.   The Need to Minimize Sentencing Disparities............23

          1.   The Co-conspirators' Sentences....................23

          2.   Stephany Perez....................................24

V.   CONCLUSION....................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

**Cases**

<u>United States v. Borden</u>,
  10 F.3d 1058 (4th Cir. 1993) ....................................... 8

<u>United States v. Bradley</u>,
  117 F.3d 1426 (9th Cir. 1997) ...................................... 8

<u>United States v. Cook</u>,
  81 F.3d 170, 1996 WL 144224 (9th Cir. 1996) ....................... 7

<u>United States v. Griffith</u>,
  584 F.3d 1004 (10th Cir. 2009) .................................... 8

<u>United States v. Haywood</u>,
  777 F.3d 430 (7th Cir. 2015) ..................................... 13

<u>United States v. Kirk Tang Yuk</u>,
  885 F.3d 57 (2d Cir. 2018) ....................................... 13

<u>United States v. Koczuk</u>,
  252 F.3d 91 (2d Cir. 2001) ........................................ 8

<u>United States v. Lebedev</u>,
  932 F.3d 40 (2d Cir. 2019) ....................................... 12

<u>United States v. Oehlenschlager</u>,
  76 F.3d 227 (8th Cir. 1996) ....................................... 7

<u>United States v. Rodebaugh</u>,
  798 F.3d 1281 (10th Cir. 2015) .................................... 8

<u>United States v. Si Lu Tian</u>,
  339 F.3d 143 (2d Cir. 2003) ...................................... 12

<u>United States v. Walter-Eze</u>,
  869 F.3d 891 (9th Cir. 2017) ................................. 10, 11

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

**Statutes**

16 U.S.C. §§ 3372(a)(1)................................................ 1

18 U.S.C. § 545....................................................... 1, 6

**Other**

U.S.S.G. § 1B1.3(a)(2)................................................ 8

U.S.S.G. § 3B1.1...................................................... 13

U.S.S.G. § 3B1.1(a)................................................. 5, 10, 12

U.S.S.G. § 3B1.1(b)................................................... 13

U.S.S.G. § 3C1.1................................................... 5, 14

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.    INTRODUCTION

3      Defendant JOSE MANUEL PEREZ ("defendant") is one of the largest
4 smugglers caught as part of Operation Bale Out,[1] a long-term
5 investigation by the United States Fish and Wildlife Service ("FWS")
6 into the smuggling of wildlife from Mexico into the United States.
7 Defendant and his co-conspirators, who included Mexico-based
8 suppliers and middlemen in both Mexico and the United States, were
9 collectively responsible for smuggling tens of thousands of animals
10 across the border, with a total fair-market value of several million
11 dollars.

12      On August 24, 2022, defendant pled guilty to Counts Nine and Ten
13 (Smuggling Goods Into the United States, in violation of 18 U.S.C. §
14 545) and Count Twelve (Wildlife Trafficking, in violation of 16
15 U.S.C. §§ 3372(a)(1), 3373(d)(1)(B)) in the First Superseding
16 Indictment ("FSI").  In the factual basis to defendant's plea
17 agreement, he admitted to a scheme whereby he personally caused the
18 smuggling of at least 1,700 animals into the United States from 2016
19 through 2022, and then fled to Mexico while on pretrial release.

20      On December 21, 2022, the United States Probation Office
21 ("USPO") disclosed its Presentence Investigation Report ("PSR") for
22 defendant.  The PSR determined that defendant has a total offense
23 level of 25 and falls within Criminal History Category V, resulting
24 in a Guidelines range of 100 to 125 months in prison.  The USPO
25 recommends a low-end sentence of 100 months, followed by a three-year
26 period of supervised release.

27

28
---
[1] "Bale" is a group of turtles.

For the reasons set forth herein, the government concurs with the USPO's Guidelines calculations and recommendation and also recommends a sentence of 100 months, followed by a three-year period of supervised release with the conditions recommended by the USPO.

## II.   STATEMENT OF FACTS

### A.   Defendant's Smuggling Scheme

Beginning no later than January 2016 and continuing through February 2022, defendant and his co-conspirators smuggled wildlife into the United States from Mexico and elsewhere (including Hong Kong) without obtaining the permits required by the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") and without declaring any wildlife imported into the United States.  In most cases, defendant purchased the wildlife from suppliers, caused it to be smuggled into the United States, and then resold the wildlife, primarily to customers in the United States.  In other cases, defendant traveled to Mexico to obtain wildlife directly and smuggled it back into the United States.  In total, defendant caused the illegal smuggling and importation of at least 1,700 animals with a fair market value in excess of $739,000.  (PSR ¶¶ 20, 26, 28, 44, 47, 57; Dkt. No. 103 at 7:22-8:3, 9:3-6.)

L.C. (Co-conspirator #1 in the FSI) was one of defendant's suppliers based in Mexico.  On numerous occasions, defendant and L.C. agreed to a sale of wildlife, and then L.C. arranged for the wildlife to be transported from locations within Mexico to Juarez, Mexico. (PSR ¶ 21; Dkt. No. 103 at 8:4-8.)

Jorge Alonso Gutierrez (Co-conspirator #3 in the FSI) retrieved from the Juarez airport the wildlife that defendant had purchased from L.C.  Gutierrez then delivered the wildlife to Alejandro

Carrillo (Co-conspirator #2 in the FSI) at a prearranged place in Juarez, Mexico, and Carrillo (who was paid a "crossing fee" by defendant and others) transported the wildlife in his car from Juarez to his residence in El Paso, Texas.  Defendant provided shipping labels to Carrillo, bearing addresses in the United States, including addresses where defendant lived in Missouri and, later, Oxnard, California, to which Carrillo shipped the wildlife.  Defendant knew that Carrillo did not obtain CITES permits, declare the wildlife to U.S. authorities, or transport the wildlife through designated ports of entry, all of which defendant knew was contrary to law.  (PSR ¶¶ 21, 23-25; Dkt. No. 103 at 8:4-8, 8:17-9:2.)

Co-defendant Stephany Perez (defendant's sister), R.G. (Co-conspirator #4 in the FSI), and A.M. (defendant's girlfriend and Co-conspirator #5 in the FSI) assisted defendant by receiving and shipping animals, as well as arranging payment for animals purchased and receiving payment for animals sold, particularly when (1) defendant was incarcerated between August 25, 2016, and April 9, 2018, and between November 4, 2018 and October 23, 2019, and (2) defendant was travelling in Mexico for extended periods in 2021 and early 2022.  (PSR ¶ 27; Dkt. No. 103 at 9:7-17.)

After Carrillo and Gutierrez were arrested as part of Operation Bale Out and defendant lost access to his middlemen, defendant began travelling to Mexico frequently to acquire additional live animals taken from the wild and to smuggle the animals into the United States, so that he could maintain his supply.  Defendant was caught on February 25, 2022 at the border at San Ysidro, where he had crossed approximately 36 times in the previous year.  He lied to a border official and said he had nothing to declare, when in fact he

had 60 reptiles (57 still alive) hidden in his clothing.  (PSR ¶¶ 28,
44-46; Dkt. No. 103 at 9:18-25, 17:26-19:2.)

Defendant used an alias, "Julio Rodriguez," in order to conceal
his participation in the unlawful scheme, including through the use
of a Facebook account in the name of "Julio Rodriguez."  With
assistance from Stephany Perez and A.M., defendant used this Facebook
account to communicate with his co-conspirators regarding their
smuggling activities and to advertise and sell the smuggled wildlife.
(PSR ¶ 29; Dkt. No. 103 at 9:26-10:7.)

Counts Nine, Ten, and Twelve of the FSI charge defendant with
three smuggling events that were representative examples of the
scheme.  In the factual basis to his plea agreement, defendant admits
to many more such incidents.  (See Dkt. No 103 at 12-18; PSR ¶¶ 32-
46.)

**B.  Defendant's Flight to Mexico While on Pretrial Release**

Defendant was indicted in this case on February 24, 2022 and
arrested the next day while smuggling animals into the United States.
He remained in custody until he was released on bond on May 16, 2022.

In his effort to be released, defendant promised the Court,
repeatedly, that he would never abandon his children (whom he brought
to Court for several detention hearings).  For example, at a bond
review hearing on April 29, 2022, defendant, accompanied by his three
young sons, told the Honorable Rozella Oliver, United States
Magistrate Judge, the following:

I would never flee on this case….

So I would never in a million years flee because that's my
life….

4

1
2

So it's like – it's not like I would, I would disappear, you know, once I'm out. I would – I would have no life.  I would have no life….

3
4

I would never – I would never flee from – I would never run away because I don't have no life if I do….

5

So I would never – I would never run away because I have – I have no life….

6
7
8

So when [the government is] saying that maybe I'd flee or maybe I – I would switch on my family, well, that's something that – like it's hard for me because I – everyone in my family knows I'd never do that….

9
10

So, Your Honor, it's just – it's really hard for me to sit here and you know, think about, you know, something else, my life without reptiles and me thinking about fleeing. I would have no life.

11

(Exh. A at 19-22.)

12      After defendant was released from custody on May 16, 2022, he

13  cut off his ankle bracelet on June 5, 2022 and fled to Tijuana with

14  his girlfriend A.M. (Co-conspirator #5), leaving his young children

15  behind.  On June 16, 2022, law enforcement officials apprehended

16  defendant in Tijuana, and he was returned to custody in the United

17  States.  (Dkt. No. 103 at 19:7-12.)

18  **III. THE PSR AND THE GOVERNMENT'S OBJECTIONS**

19      The PSR calculated defendant's total offense level as follows:

| Base Offense Level: | U.S.S.G. § 2Q2.1(a) | 6 |
|---|---|---|
| Enhancements: | | |
| • Commercial purpose | U.S.S.G. § 2Q2.1(b)(1) | +2 |
| • Market value | U.S.S.G. §§ 2Q2.1(b)(3)(A), 2B1.1(b)(1)(H) | +14 |
| • Role | U.S.S.G. § 3B1.1(a) | +4 |
| • Obstructing the administration of justice | U.S.S.G. § 3C1.1 | +2 |
| Acceptance of Responsibility | U.S.S.G. § 3E1.1 | -3 |
| **Total Offense Level:** | | **25** |

(PSR ¶¶ 54-68.)

The USPO determined that defendant fits within Criminal History Category V.  (PSR ¶ 83.)  Accordingly, the USPO calculated that defendant's Guidelines range is 100 to 125 months.  (PSR ¶ 120.)  In its recommendation letter, the USPO recommends a low-end sentence of 100 months' imprisonment.  (Dkt. No. 122.)

The government concurs with the PSR's Guidelines calculations. The government has the following minor corrections to the PSR, none of which affects the PSR's calculations:

- PSR ¶ 2:  Count Nine charges defendant with a violation of 18 U.S.C. § 545, not § 554.

- PSR ¶ 18:  The PSR omits that defendant was apprehended on June 15, 2022 in Mexico after removing his Court-ordered monitoring device, as he admitted in his plea agreement.  (See Dkt. No. 103 at 7-12.)

- PSR ¶ 32(d):  The first sentence incorrectly states that AC (i.e., Carrillo) smuggled the wildlife "to JAG in Juarez"; in fact, Carrillo smuggled the wildlife he had picked up from JAG in Juarez.

- PSR ¶ 33:  Defendant was arrested on November 4, 2018, not November 20, 2018.

- PSR page 11:  The second subheading should read "February 25, 2022 Conduct," rather than "August 25, 2022 Conduct."

- PSR ¶ 48:  Defendant is pleading guilty to a Title 16 offense in addition to Title 18 offenses.  While not relevant to any Guidelines enhancements, many of the animals that defendant caused to be smuggled died as a result of the border crossings and subsequent illicit shipments.

6

1    **IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

2         The government respectfully recommends a sentence of 100 months'

3    imprisonment, followed by three years of supervised release with the

4    conditions recommended by the USPO.

5         **A.   The Sentencing Enhancements**

6         As stated above, the government concurs with the PSR's

7    Guidelines calculations.  For the Court's benefit, the government

8    provides more detailed explanations below regarding the recommended

9    enhancements.

10             1.   The Market Value of the Smuggled Wildlife

11        The PSR correctly determined that a 14-level enhancement should

12   apply pursuant to Sections 2Q2.1(b)(3)(A) and 2B1.1(b)(1)(H) because

13   the market value of the wildlife that defendant smuggled was between

14   $550,000 and $1,500,000.  (PSR ¶¶ 47, 57.)

15        As set forth in the Application Notes to Section 2Q2.1, "[w]hen

16   information is reasonably available, 'market value' under subsection

17   (b)(3)(A) shall be based on the fair-market retail price."  U.S.S.G.

18   § 2Q2.1 cmt. n.4.  See also United States v. Cook, 81 F.3d 170, 1996

19   WL 144224, *2 (9th Cir. 1996) ("The court properly exercised its

20   discretion to value each tarantula at $214 even though Cook received

21   only $37.50 for each.").

22        "Where the fair market retail price is difficult to ascertain,

23   the court may make a reasonable estimate using any reliable

24   information…."  U.S.S.G. § 2Q2.1 cmt. n.4.  See also United States v.

25   Oehlenschlager, 76 F.3d 227, 230 (8th Cir. 1996) (affirming district

26   court's estimate of value of eggs based on the estimated resale value

27   of the adult birds); United States v. Bradley, 117 F.3d 1426 (9th

28   Cir. 1997) ("Obviously, a wide range of methods is acceptable.").

7

The defendant's profit is not the correct measure of loss.  See United States v. Borden, 10 F.3d 1058, 1063 (4th Cir. 1993) (rejecting defendant's argument that "the district court should have used his profits from the musseling activities rather than the market value of the mussels as the basis for any § 2Q2.1(b)(3) enhancement").  Likewise, the economic loss caused by the offense is not the correct measure of market value.  See United States v. Koczuk, 252 F.3d 91, 96 (2d Cir. 2001) ("The enhancement provision in Section 2Q2.1 instructs a sentencing court to base the enhancement on the market value or the fair-market retail price of the endangered species involved, not on the economic loss caused by an offense.") (citing cases).

The fair-market retail value must be based on all of the wildlife smuggled by defendant that was "part of the same course of conduct or common scheme or plan" as the smuggling and wildlife trafficking counts of conviction.  U.S.S.G. § 1B1.3(a)(2); see also United States v. Rodebaugh, 798 F.3d 1281, 1300 (10th Cir. 2015) ("Mr. Rodebaugh contends the court erred in considering, as relevant conduct, the value of the animals taken as a result of unindicted, dismissed, or acquitted conduct and in determining this conduct was illegal. But '[r]elevant conduct under the Guidelines ... comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct.'") (quoting United States v. Griffith, 584 F.3d 1004, 1012 (10th Cir. 2009)).

To estimate loss in this case, the FWS compiled a spreadsheet of every smuggling transaction that the agents were able to identify in

Operation Bale Out between January 7, 2015 and September 5, 2020.[2]
For each transaction, the agents identified the persons involved as
well as the species of wildlife smuggled, the number of animals, and
the crossing fee paid.  The agents then conducted research as to the
fair-market retail value of each animal smuggled, both by looking at
the prices that the co-conspirators had bought and sold the wildlife,
and conducting online research as to the prevalent commercial rates
for the same species.  (See Exh. B.)  If it was not clear from the
evidence how many animals were included in a shipment, the agents
conservatively calculated that only one animal was included (i.e.,
even though the actual quantity may have been much greater).  And if
it was not clear from the evidence which species were included in a
particular shipment, the agents conservatively calculated the market
value of that shipment as zero (i.e., even though the market value of
the animals in the shipment obviously was greater than zero).

     Using this overall data, the agents then created individual
spreadsheets for each co-conspirator they had identified in Operation
Bale Out based on the smuggling transactions in which they were
involved.  For defendant, the agents determined that he had caused
the smuggling of 1,722 animals from Mexico in 87 transactions between
March 27, 2015 and November 20, 2018, with a total fair-market retail
value of $739,485.  (See Exh. C; PSR ¶ 57.)  This is a very
conservative estimate, given that (1) it is undisputed that defendant
continued his smuggling activities from November 2018 through
February 2022, as set forth in the factual basis of the plea
agreement; (2) as noted above, agents used a conservative estimate of

---

     [2] The government has provided defense counsel with a complete
set of the spreadsheets discussed herein.

one animal for transactions where they were unable to determine how many animals defendant had smuggled; and (3) for a number of transactions, the agents conservatively estimated the market value as zero, where they could not identify which species were smuggled.

The other courts that have sentenced co-conspirators convicted as part of Operation Bale Out have relied on this same methodology and data in determining the fair-market value of the smuggled wildlife. When Alejandro Carrillo (Co-conspirator #2 in the FSI) was sentenced for his role in the scheme (W.D. Tex. Case No. 19-CR-3932), the PSR and the Court adopted the methodology set forth in spreadsheets prepared by FWS to calculate the fair-market value and imposed an 18-level enhancement pursuant to Sections 2Q2.1(b)(3)(A) and 2B1.1(b)(1)(J) (Carrillo had smuggled wildlife valued at $4,397,341). Likewise, when Jorge Alonso Gutierrez (Co-conspirator #3 in the FSI) was sentenced (W.D. Tex. Case No. 20-CR-920), the Court accepted the government's methodology and relied on the same spreadsheets to calculate the fair-market value of the wildlife smuggled by Gutierrez.

## 2. Defendant's Role in the Scheme

The PSR correctly determined that a four-level enhancement should apply pursuant to Section 3B1.1(a) because defendant was the organizer and leader of criminal activity that involved five or more participants. (PSR ¶¶ 59-61.) The conspiracy charged in the FSI involved, at a minimum, the following seven criminal participants:

- Defendant himself counts as one participant. See United States v. Walter-Eze, 869 F.3d 891, 914 (9th Cir. 2017) (the defendant "may be included among the participants in the criminal activity for purposes of section 3B1.1(a)") (citations omitted).

10

- Co-defendant Stephany Perez, whom defendant directly supervised in the scheme, counts as a second participant. At defendant's direction, Stephany Perez assisted him in advancing all aspects of the scheme, particularly when defendant was incarcerated. (See FSI at 2:1-4; id., Overt Acts 25-28, 60-64, 66, 68-69, 75-81; Dkt. No. 103 at 9:7-17; id. at 15:16-22; Dkt. No. 119 at 6-11.)

- L.C. (Co-conspirator #1 in the FSI) was a third participant. L.C. was one of the main Mexico-based suppliers from whom defendant purchased wildlife. (See FSI at 2:4-11; Dkt. No. 103 at 8:4-8.)

- Carrillo (Co-conspirator #2 in the FSI) was a fourth participant. Carrillo was the middleman based in El Paso, Texas, who transported most of the wildlife across the border from Juarez, Mexico on behalf of defendant. (See FSI at 2:12-18; Dkt. No. 103 at 8:17-9:2.) When Carrillo transported the wildlife, he received directions and funds from defendant. For his role in the scheme, Carrillo was charged in a 13-count indictment in the Western District of Texas in December 2019 (Case No. 19-CR-3932), charging conspiracy to traffic wildlife, smuggling, and violations of the Lacey Act's trafficking and false records provisions. In July 2020, he pled guilty to the conspiracy and one count of smuggling. On March 25, 2021, Carrillo was sentenced to 20 months in prison.

- Gutierrez (Co-conspirator #3 in the FSI) was a fifth participant. Gutierrez was a middlemen based in Juarez, Mexico who received the wildlife shipments from L.C. (and other suppliers in Mexico) and delivered them to Carrillo in Juarez.

11

1    (See FSI at 2:19-25; Dkt. No. 103 at 8:9-16.)  For his role,

2    Gutierrez was indicted in the Western District of Texas in March

3    2020 on 24 counts of conspiracy, smuggling, and Lacey Act

4    violations (Case No. 20-CR-920).  He pled guilty on April 30,

5    2021; on September 2, 2021, he was sentenced to 37 months in

6    prison.

7  • R.G. (Co-conspirator #4 in the FSI) was a sixth criminal

8    participant.  R.G. was a buyer of smuggled wildlife based in the

9    United States.  (See FSI at 2:26-3:2.)  Beginning in 2014, R.G.

10   purchased reptiles from defendant.  For some of the time when

11   defendant was incarcerated, R.G. managed defendant's operation

12   at defendant's direction from jail, including selling

13   defendant's reptiles to customers and traveling from Florida to

14   Missouri to retrieve animals from defendant's home.  (See FSI,

15   Overt Acts 22, 23, 25, 27, 28; Dkt. No. 103 at 9:7-17.)

16  • A.M. (Co-conspirator #5 in the FSI) was a seventh criminal

17   participant.  She was defendant's girlfriend and, under

18   defendant's supervision, helped him carry out the scheme,

19   particularly when he was incarcerated.  (See FSI at 3:3-6; id.

20   at 9:26-10:26; id., Overt Acts 67, 86, 95, 97, 99; Dkt. No. 103

21   at 9:7-17; id. at 15:16-20.)

22   All of the aforementioned co-conspirators count as criminal

23  participants under Section 3B1.1(a) regardless of whether defendant

24  supervised each of them.  See United States v. Lebedev, 932 F.3d 40,

25  56 (2d Cir. 2019) ("The guidelines 'only require that the defendant

26  be an organizer or leader of one or more of those participants for

27  the section 3B1.1(a) enhancement to be appropriate.'") (quoting

28  United States v. Si Lu Tian, 339 F.3d 143, 156 (2d Cir. 2003));

1    <u>United States v. Kirk Tang Yuk</u>, 885 F.3d 57, 83 (2d Cir. 2018)

2    ("[T]he Guidelines require only that the conspiracy actually involve

3    five or more participants, not that the organizer be aware of all

4    participants."); <u>United States v. Haywood</u>, 777 F.3d 430, 434 (7th

5    Cir. 2015) ("[A] defendant can be an organizer or leader without

6    knowing every participant.").

7         Defendant was an organizer and leader, and not just a manager or

8    supervisor under Section 3B1.1(b), within the scope of this extensive

9    criminal scheme.  "In distinguishing a leadership and organizational

10   role from one of mere management or supervision, titles such as

11   'kingpin' or 'boss' are not controlling," and "[t]here can, of

12   course, be more than one person who qualifies as a leader or

13   organizer of a criminal association or conspiracy."  U.S.S.G. § 3B1.1

14   cmt. n.4.  Factors to consider include "the exercise of decision

15   making authority, the nature of participation in the commission of

16   the offense, the recruitment of accomplices, the claimed right to a

17   larger share of the fruits of the crime, the degree of participation

18   in planning or organizing the offense, the nature and scope of the

19   illegal activity, and the degree of control and authority exercised

20   over others."  <u>Id.</u>

21        Defendant's role as an organizer and leader is perhaps best

22   exemplified by the fact that he continued to control the wildlife

23   smuggling and trafficking business while he was in jail – from August

24   2016 to April 2018, and from November 2018 to October 2019 –

25   through the recruitment and direction of, among others, Stephany

26   Perez, A.M., and R.G.  Defendant directed their activities by means

27   of telephone calls from jail.  (<u>See</u> Dkt. No. 103 at 9:7-17; <u>see also</u>,

28   <u>e.g.</u>, <u>id.</u> at 15:16-22; <u>id.</u> at 16:27 – 17:3.)  Indeed, as noted above,

1  when defendant was incarcerated in November 2018, he told Stephany
2  Perez in a recorded jail call, "The business is running smooth. I can
3  run the business from in here."  (See id. at 15:16-22; PSR ¶ 61.)  In
4  addition, throughout the scheme, defendant instructed Carrillo where
5  to ship the wildlife that Carrillo had smuggled across the border on
6  defendant's behalf and directed Stephany Perez where to send the
7  payments for the smuggled wildlife.  (See generally Dkt. No. 103 at
8  11:21 – 17:6.)

9          3.   Defendant's Obstruction of Justice
10         The PSR correctly determined that a two-level enhancement should
11 apply pursuant to Section 3C1.1 because defendant fled to Mexico on
12 June 5, 2022 while on pretrial release.  (PSR ¶¶ 62-63.)  Section
13 3C1.1 makes clear that the adjustment applies to "escaping or
14 attempting to escape from custody before trial or sentencing; or
15 willfully failing to appear, as ordered, for a judicial proceeding."
16 U.S.S.G. § 3C1.1 cmt. n. 4(E).

17         As defendant admitted in his plea agreement, he cut off his GPS
18 ankle monitor the day before a court hearing (which he had requested)
19 scheduled for 3:00 p.m. on June 6, 2022.  (See Dkt. No. 103 at 19:7-
20 12.)  Defendant willfully failed to appear at that hearing and fled
21 to Mexico.  Defendant did not return to the United States on his own
22 volition, but rather remained a fugitive in Tijuana until he was
23 apprehended by law enforcement in Mexico on June 16, 2022.  (See id.
24 at 19:11-12.)

25         As set forth in Part II.B. supra, defendant's flight to Mexico
26 came after he promised the Court, repeatedly, that he was not a
27 flight risk and that he would never abandon his children.

28

### 4.   Pecuniary Gain/Commercial Purpose

The PSR correctly determined that, as defendant conceded in his plea agreement, a two-level enhancement should apply pursuant to Section 2Q2.1(b)(1) because he carried out the scheme for his own pecuniary gain and the scheme involved a commercial purpose, i.e., the purchase and resale of smuggled wildlife.  (See PSR ¶¶ 55-56; Dkt. No. 103 at 20:2-3.)

### B.   The Nature and Circumstances of the Offense

As a convicted felon, defendant operated a sophisticated, large-scale international wildlife-smuggling scheme for at least six years. Under the government's very conservative estimates, defendant smuggled more than 1,700 reptiles from Mexico, with a total fair-market retail value of at least $739,485.

Defendant continued running the scheme even when he was in jail. For two lengthy periods – August 2016 to April 2018, and November 2018 to October 2019 – defendant used family members and his girlfriend to carry out the smuggling business on his behalf while he was incarcerated.  Defendant continued the scheme upon his release from prison in October 2019, notwithstanding his being on probation for the next three years.

Defendant was one of the major smugglers identified in Operation Bale Out.  In many ways he transformed the illegal trade of reptiles from Mexico.  What traditionally had been a small-scale trade conducted by hobbyists was transformed by defendant's use of the tactics he had learned as a gang member involved in the drug and gun trade.[3]  Defendant's brash methods included trafficking wildlife on

---

[3] Defendant has compared himself to the notorious cocaine trafficker (and animal collector) Pablo Escobar.

15

an unprecedented scale and an unprecedented rate; his use of mules, an alias, and family members to conceal his own role and to operate the business while he was incarcerated; and his relentless self-promotion by means of social media.  After his middlemen Carrillo and Gutierrez were caught, defendant did not slow down; he simply started travelling to Mexico himself to obtain more wildlife to smuggle.

While wildlife smuggling may not present as much of a public safety threat as some other crimes the government confronts, it is a serious international problem.  Many of the species defendant was trafficking are recognized as threatened under CITES, a multinational treaty specifically designed to prevent the lawless trafficking of wildlife.  Reptiles, in particular, are relatively easy to smuggle and are popular in the pet trade; this, along with the destruction of their native habitats, is the reason why they are threatened.  Defendant's scheme caused thousands of reptiles to be taken from the wild, smuggled across the border, and then sold into the pet trade.

Despite defendant's self-promotion of himself as a protector of the wildlife he trafficked, many of the animals that defendant smuggled died as a result of the smuggling.  After being taken from their natural habitat, the animals cruelly had their limbs and mouths bound to prevent them from moving during transport.  The animals were then crammed into small packages that could be hidden from view by authorities at the border.  Based on the messages exchanged by defendant and his co-conspirators, the government estimates that hundreds, perhaps thousands, of the animals trafficked in the conspiracy did not survive the transport from Mexico into the United States.  Many of the animals died along the route, some from the shock and trauma, others from the hot/cold temperatures they were

subject to while being flown, or driven, from one location to another.

In sum, defendant's long-running scheme brazenly and stubbornly flaunted CITES and the wildlife conservation efforts of the United States and Mexico.  After defendant was incarcerated (twice) during the scheme, he kept the scheme going from jail.  After his middlemen were caught, defendant replaced his supply chain by smuggling the wildlife himself.  And, as explained below, even after defendant was indicted in this case, he continued promoting himself on social media by publicly attacking the integrity of the government's investigation.

**C.   Defendant's History and Characteristics**

Defendant's personal history is aggravating, both before and after being caught for running the scheme as a convicted felon on probation.  Despite defendant's relatively normal upbringing (PSR ¶¶ 93-99), he has admitted to being a member of the Colonia Chiques gang and has a lengthy criminal history.[4]  (See PSR ¶¶ 72-89.)  While the PSR correctly identifies defendant's prior convictions, it glosses over important details of his background.  Given defendant's portrayal of himself as a stable family man, the government provides a few more details below.

1.   <u>Defendant's Assault with a Deadly Weapon</u>

Perhaps the most notable omission in the PSR is defendant's conduct on September 10, 2011, when he intentionally drove his car

---

[4] On December 16, 2022, defendant was indicted on two counts of being a felon in possession of firearms.  <u>See</u> <u>United States v. Jose Manuel Perez</u>, 22-CR-597-RGK.  If he is convicted on those charges, defendant will be punished separately for his illegal gun possession. Accordingly, the government recommends that this Court not take the firearms issue into account when imposing a sentence in this case.

over two men.  (See PSR ¶ 78.)  According to reports from the Oxnard

Police Department, after a fight broke out in a restaurant parking

lot, police arrived and took a recorded, Mirandized statement from

defendant.  Defendant admitted to being high on cocaine, and,

according to the police report, said the following:

> Perez initially got into his vehicle and fled the area.  He
> then realized that being a Colonia Chiques gang member and
> leaving a fight without getting involved would be wrong of
> him, and he would get in trouble for it later with his
> fellow gang members, so he turned back around after
> approximately 30 seconds and drove back into the parking
> lot.

(Exh. D at 4 of 13.)

As the police report notes, "other witnesses and other victims

identified Perez as being the driver of the Cadillac CTS.  There was

also video obtained that showed Perez deliberately ran people over

with his vehicle."  (Id. at 5 of 13.)  The victim, who had been

stabbed by defendant's fellow gang members moments beforehand, said

that defendant was driving "at a high rate of speed, extremely

erratically, back and forth in the parking lot, and that [defendant]

was attempting to run him over.  He said [defendant] would drive at

him and strike him as he was trying to move out of the way.  He said

[defendant] would then turn the vehicle around and drive back at him

at a high rate of speed.  He said [defendant] made approximately four

passes at him and struck him twice with the vehicle."  (Id. at 12 of

13.)

Defendant pled guilty to state charges for Assault With a Deadly

Weapon and Participation in a Criminal Street Gang.  (PSR ¶ 78.)

Perhaps because he was only 19 years old, defendant got a break and

was sentenced to only 180 days jail and 60 months' probation.  (Id.)

In July 2013, while he was still on probation, defendant was arrested

1   for being a felon in possession of ammunition and resisting arrest in
2   Ventura County.  (PSR ¶ 79.)

3          Rather than face those charges and the revocation of his
4   probation in the ADW case, defendant fled with his wife to Missouri;
5   the Ventura County Superior Court issued an arrest warrant for
6   defendant for his failure to appear.  (See Exh. E at 1 & 3 of 7.)  In
7   Missouri, to evade the California warrant, defendant assumed the
8   alias "Julio Rodriguez."  (See id. at 3 of 7.)  In July 2014,
9   defendant obtained a genuine Missouri driver's license with his own
10  photograph but the name of "Julio Rodriguez."  (See id. at 3 & 7 of
11  7.)  He also opened at least one bank account in the name of "Julio
12  Rodriguez," and was employed under that name at a car wash.  (See id.
13  at 3 of 7.)  And defendant began his wildlife trafficking scheme,
14  operating under the name "Julio Rodriguez," "in order to conceal his
15  participation in the unlawful scheme."  (Dkt. No. 103 at 9:26-28; PSR
16  ¶ 29.)

17         Defendant's ruse worked until August 25, 2016, when he was
18  arrested in Missouri for being a fugitive from California.  (PSR ¶
19  89.)  On September 4, 2016, defendant was extradited to California to
20  face the pending charges.  (See Exh. E at 3 of 7.)  As discussed
21  above, he continued the wildlife trafficking scheme from inside the
22  Ventura County Jail.

23              2.   Defendant's Assault of His Sister

24         The PSR does not mention defendant's assault of his sister,
25  L.P., on June 8, 2021.  According to the Oxnard Police Department's
26  reports, L.P. told police that she did not want defendant to be
27  prosecuted for the assault "because of her mother and father who do
28  not want any charges against their son."  (Exh. F at 6 of 9.)

1    According to L.P., defendant entered their parents' house and said to

2    L.P., "Fuck you, fat bitch," and then threw a candle and glass

3    container at L.P., causing a gash on her arm.  (Id. at 5 of 9.)

4    L.P.'s nine-year old daughter (defendant's niece) witnessed the

5    assault, and told police, "I don't like it when he hits my mom."

6    (Id. at 8 of 9.)  L.P. told police that she would seek a restraining

7    order against defendant.  (Id. at 6 of 9.)

8              3.   Defendant's Drug Use

9          As noted above, defendant was high on cocaine when he committed

10   the ADW in 2011.  While such drug use might be viewed as unfortunate

11   but understandable conduct given that defendant was only 19 years old

12   at the time, the record indicates that defendant has done nothing to

13   curtail his drug use since then.  When agents conducted a search of

14   defendant's iPhone in 2022 pursuant to a federal warrant, they found

15   a trove of evidence confirming defendant's cocaine use in 2021 and

16   2022.  (See, e.g., Exhs. G, H, I, J.)  The PSR does not reconcile

17   defendant's self-portrayal as a stable family man with his long-term

18   drug use and violent conduct.

19             4.   Defendant's Post-Indictment Conduct in This Case

20         When defendant was finally caught in this case, he spent months

21   persuading the Court to reduce his bond so that he could be released

22   from custody.  Portraying himself as a law-abiding family man whose

23   focus was his three young children, defendant eventually succeeded in

24   obtaining his release from custody in May 2022.  Defendant then took

25   two unusual steps.

26         First, and most troubling, defendant fled to Mexico.  As with

27   his flight to Missouri as a fugitive in 2013, defendant did not

28   return to California voluntarily; he was apprehended by Mexican

authorities and returned to federal custody.  Defendant's father had

posted a $5,000 secured bond to facilitate his son's release (see

Dkt. No. 63); defendant responded to his father's generosity by

promptly cutting off his GPS ankle monitor and fleeing the country.

Second, defendant began using social media to cast aspersions at

and essentially taunt the government while he remained on bond.  On

May 17, 2022, for example, defendant posted the following on

Facebook:

> Going up against the feds. I'll be making my case public so
> everyone can see how low they stoop and the lies they try
> and use to scare people. I'm all about my reptiles and will
> stand up for them. Exercising my freedom of speech right[.]
> Fuck The Feds.

(Exh. K.)  That same day, defendant posted the following on Facebook:

> I will post the rest of the evidence I got against the
> feds. Lol if I get taken back into custody it's because
> they want me to shut up but once again they fuck with my
> family and let my animals die it's on fuck the feds… Feds
> don't play right they will commit perjury and lie with out
> caring about anything. Whatever it takes to win their case.

(Exh. L.)

Similarly, defendant soon thereafter posted on Facebook an image

of the government's (successful) ex parte application to have the

trial date moved from May 31, 2022 to July 26, 2022.  In large block

letters, Perez wrote:

> 6 years and they still ain't ready for a trial… only way
> they will win is to screw my innocent family over and hold
> me in custody away from my family . . . careful all you
> Hypocrites these cowards don't care they will attack anyone
> to win a case and give 2 fucks about animals … Feds ain't
> shit on a fair fight.

(Exh. M.)

On May 23, 2022, defendant went so far as to email one of the

undersigned prosecutors directly, with a thinly veiled threat:  "I

will do the most to fight my case if I have too [sic] and I won't stop at nothing."

In sum, while defendant deserves credit for his acceptance of responsibility in this case, it must be viewed in context.  His guilty pleas came only after his flight to Mexico and his public and private attacks against the prosecutors and agents who investigated him.  Defendant's disrespect for law enforcement after he was apprehended in 2022 was not an aberration but rather a continuation of a years-long pattern of thinking that he was above the law.

### D.   The Section 3553(a)(2) Factors

Pursuant to Section 3553(a)(2), the recommended sentence would reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct, and protect the public from further crimes by defendant.

This is a case where individual and general deterrence are particularly important.  Individual deterrence is necessary because defendant has demonstrated an unwillingness to stop committing crimes, even when he is incarcerated or on probation.  General deterrence is needed because defendant is a well-known wildlife smuggler (the self-proclaimed "Pablo Escobar" of the reptile trade).  Reptiles are relatively easy to smuggle and smugglers often are not caught; when a major smuggler is caught, such as here, it is important to send a message to the pet-trade community that smuggling threatened species carries serious consequences.  Individuals who profit from the illegal and cruel wildlife trade perpetuate the market for the wildlife and overwhelm conservation efforts undertaken by the United States and Mexican governments.

**E.    The Need to Minimize Sentencing Disparities**

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  A sentence of 100 months' imprisonment would not cause any such disparities.

1.    The Co-conspirators' Sentences

Carrillo (Co-conspirator #2 in the FSI) was charged in a similar 13-count indictment in the Western District of Texas in December 2019 (Case No. 19-CR-3932).  The indictment charged Carrillo with conspiracy to traffic wildlife, smuggling, and violations of the Lacey Act's trafficking and false records provisions.  In July 2020, Carrillo pled guilty to the conspiracy count and one count of smuggling ███████████████████████████.

On March 25, 2021, Carrillo was sentenced to 20 months in prison.  Carrillo was not similarly situated to defendant.  In contrast to defendant, ████████████████████████████████████ ████████████████████████████████████████ ██████; Carrillo was in his 60s and diabetic; he was the sole caregiver for his ill wife; he had no criminal history (other than a dismissed case from 1994); and his role in the scheme was that of a middleman at the border, taking direction from other co-conspirators including defendant.

Gutierrez (Co-conspirator #3 in the FSI) was indicted in the Western District of Texas in March 2020 on 24 counts of conspiracy, smuggling, and Lacey Act violations (Case No. 20-CR-920).  He pled guilty on April 30, 2021 ████████████████████████████████ On September 2, 2021, Gutierrez was sentenced to 37 months in prison. Unlike defendant, Gutierrez had no criminal history; ████████████

23

1    ███████████████████████████████████    and (like Carrillo) his

2    role was that of a middleman at the border.

3         As a result, the sentences imposed on Carrillo and Gutierrez,

4    while significant, evidence why defendant deserves a more severe

5    punishment.  Defendant's role in the conspiracy was greater than that

6    of the middlemen.  Defendant directed the middlemen as to when and

7    where the animals he purchased needed to be smuggled.  Defendant

8    provided precise delivery instructions and paid the middlemen

9    crossing fees.  While the middlemen, by virtue of their role in the

10   conspiracy, handled more animals than defendant, the trafficking was

11   initiated, overseen, and funded by defendant and others at his level.

12        Defendant's lengthy criminal history and post-indictment conduct

13   further set him apart from Carrillo and Gutierrez.  None of the

14   mitigating circumstances that contributed to the relatively lenient

15   sentences for his co-conspirators are present here.

16             2.   Stephany Perez

17        After being charged in the FSI with one felony count for

18   conspiracy, Stephany Perez pled guilty to a misdemeanor violation of

19   the Lacey Act for her role in the scheme on January 5, 2023.  (Dkt.

20   No. 127.)  She will be sentenced on April 27, 2023.

21        Stephany Perez is not similarly situated to her brother.  Unlike

22   defendant, Stephany Perez did not profit from the scheme (other than

23   small, occasional payments defendant provided to her).  Likewise,

24   Stephany Perez's role in the scheme was basically as an

25   administrative assistant to defendant.  There is no evidence that

26   Stephany Perez would have been involved in the scheme were it not for

27   the fact that defendant was her older brother who asked her to help

28   with his business.  Defendant, in contrast, is a convicted felon with

a lengthy criminal history and a proven track record of thinking he is above the law.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 100 months in prison, followed by three years of supervised release with the conditions recommended by the USPO.

Dated:  January 9, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MATTHEW O'BRIEN
BRIAN FAERSTEIN
Assistant United States Attorneys

GARY DONNER
Senior Trial Attorney, ECS

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1                 <u>DECLARATION OF MATTHEW O'BRIEN</u>

2      I, MATTHEW O'BRIEN, declare as follows:

3      1.   I am an Assistant United States Attorney in the United

4 States Attorney's Office for the Central District of California.  I

5 am one of the attorneys representing the government in this case.

6      2.   Attached hereto as **Exhibit "A"** is a true and correct copy

7 of a transcript from a hearing in this matter on or about April 29,

8 2022.

9      3.   Attached hereto as **Exhibit "B"** is a true and correct copy

10 of a printout of part of a spreadsheet prepared by the United States

11 Fish and Wildlife Service ("FWS") in this matter.

12      4.   Attached hereto as **Exhibit "C"** is a true and correct copy

13 of a printout of part of another spreadsheet prepared by the FWS in

14 this matter.

15      5.   Attached hereto as **Exhibit "D"** are true and correct copies

16 of redacted police reports from the Oxnard Police Department.

17      6.   Attached hereto as **Exhibit "E"** is a true and correct copy

18 of part of an investigative report from the FWS in this matter.

19      7.   Attached hereto as **Exhibit "F"** are true and correct copies

20 of redacted police reports from the Oxnard Police Department.

21      8.   Attached hereto as **Exhibit "G"** is a true and correct copy

22 of an investigative report from the FWS in this matter.

23      9.   Attached hereto as **Exhibit "H"** is a true and correct copy

24 of an investigative report from the FWS in this matter.

25      10.  Attached hereto as **Exhibit "I"** is a true and correct copy

26 of an investigative report from the FWS in this matter.

27      11.  Attached hereto as **Exhibit "J"** is a true and correct copy

28 of an investigative report from the FWS in this matter.

12.   Attached hereto as **Exhibit "K"** is a true and correct copy of a social media posting by defendant JOSE MANUEL PEREZ.

13.   Attached hereto as **Exhibit "L"** is a true and correct copy of two social media postings by defendant JOSE MANUEL PEREZ.

14.   Attached hereto as **Exhibit "M"** is a true and correct copy of part of a social media posting by defendant JOSE MANUEL PEREZ.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on January 9, 2023.

*Matthew O'Brien*
_____
MATTHEW O'BRIEN

2